IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| In re: | ) | Case No. BK20-40868-BSK |
| | ) | |
| GREG J. DAVIS and SARA M. DAVIS, husband and wife, | ) ) | Chapter 7 |
| | ) | |
| Debtors. | ) ) | |
| | ) | |
| LARRY PAULSEN, | ) | Adv. Pro. A20-4034-BSK |
| | ) | |
| Plaintiff, | ) ) | |
| vs. | ) | |
| | ) | |
| GREG J. DAVIS and SARA M. DAVIS, husband and wife, | ) ) ) | |
| Defendants. | ) | |

**Opinion**

This matter is before the court on the complaint objecting to discharge and dischargeability filed by the plaintiff Larry Paulsen. An evidentiary hearing was held on June 17, 2021. Trev E. Petersen and Eric D. Miller appeared for the plaintiff. Michael D. Carper appeared for the debtors/defendants Greg and Sara Davis. Written closing arguments were submitted, and the matter is now ready for decision.

For the reasons stated below, the plaintiff's claims are denied, and judgment is entered in favor of the debtors/defendants.

**Findings of Fact**

The debtors each own a 50% membership interest in MG Honors, LLC ("MG Honors"). MG Honors owned and operated Golf USA franchises since 2003. Greg originally owned 50% of the company. Another member owned 50%. By 2016, Greg and Sara bought out the other member and MG Honors expanded to five stores with locations in Kearney, Grand Island, North Platte, and Omaha, Nebraska, and Ames, Iowa. Greg managed MG Honors and made all business decisions on its behalf.

The plaintiff has been a close family friend of Greg's parents since the early 1990s. The plaintiff is a third-generation owner of Paulsen, Inc. ("Paulsen"), a construction company in Cozad, Nebraska. He has been its president since 1992.

MG Honors amassed significant debt with the buyout and expansion. In 2016, it owed just under $1 million to Exchange Bank. Despite Sara's grandfather being a shareholder, the bank's board did not renew and would not term out MG Honors' debt. MG Honors was also indebted to Campbell County Bank, which perfected a lien on all of MG Honors' assets on May 25, 2016. (Doc. #38; Doc. #49).

1

Needing money to pay Exchange Bank, Greg approached the plaintiff for a short-term loan. The plaintiff and his wife agreed to help. When asked whether his friendship with Greg's parents colored his judgment regarding the loan, the plaintiff responded, "I will help a friend." MG Honors, Greg, and Sara executed a $1 million promissory note in favor of the Paulsens on March 14, 2016. (Doc. #33). The note was unsecured and payable in three years or on demand. Greg orally agreed to repay the loan after MG Honors obtained bank financing.

Greg sought financing from eight to twelve banks, but no bank provided a loan. MG Honors was forced to close stores. It closed the North Platte store first. The Ames store closed in late 2018. Concerned that Greg could not get a bank loan, the plaintiff demanded payment of the note. He could not remember when. The plaintiff told Greg, "I don't like to be a bank. I don't want to be a bank. I'm not a bank. (Doc. 50; 10:15-11:20).

In December 2018, the plaintiff agreed that Paulsen would loan MG Honors $1.7 million to pay the debts owed to the Paulsens and Campbell County Bank. The plaintiff requested a personal financial statement. Greg provided one with an effective date of October 31, 2018. (Doc. #40). Paulsen also requested a first position lien on MG Honors' assets. MG Honors could not provide a first position lien. In addition to the Campbell County Bank lien, MG Honors had granted a lien to Acushnet Company. Acushnet supplied MG Honors with Titleist and Footjoy inventory. Its lien was perfected on April 15, 2016, one month before Campbell County Bank's. (Doc. #48). Greg believed Acushnet only had a lien on the specific inventory Acushnet supplied.

On December 21, 2018, MG Honors, Greg, and Sara executed a $1.7 million promissory note in favor of Paulsen. (Doc. #34). The note was payable in five years or on demand. The note does not reference any security for the debt. The debt was unsecured when Paulsen provided the funds. Greg orally agreed to pay down the loan as MG Honors closed stores.

MG Honors executed a security agreement in 2019. (Doc. #35). Although it is dated January 14, 2019, it was not signed that day. Based upon its terms, the agreement was signed on or after January 30, 2019. Under the agreement MG Honors granted Paulsen a security interest in all assets of MG Honors, LLC. The agreement provides:

> [Paulsen] shall have the rights stated in this Agreement with respect to the Collateral, in addition to all other rights which Lender may have by law, including the position assigned to Lender by Campbell County Bank in the Assignment of Security Interest dated January 30, 2019.

Greg's attorney drafted an assignment of Campbell County Bank's security interest. (Doc. #36). The original draft provided:

> CAMPBELL, pledges, assigns, and grants its security interest and first priority position pursuant to its Security Agreement with MG Honors dated May 10, 2016 to PAULSEN. This provides … CAMPBELL'S first position to PAULSEN over any and all position held by vendors of MG HONORS.
>
> MG HONORS hereby represents and warrants that except for the security interest being assigned to PAULSEN pursuant to this agreement, MG HONORS

2

> owns each item of collateral free and clear of any and all other liens, except any liens that would be subordinate to the assigned security interest of PAULSEN.

Greg emailed the draft assignment to Campbell County Bank on January 14, 2019. The bank agreed to assign its lien but refused to execute the assignment. (Doc. #37). The bank officer emailed Greg:

> [W]e do not technically have first priority position according to our latest UCC lien search conducted on 11/22/2017. At the time of our lien search a company by the name of Acushnet Company (filed: 4/15/2016) had first position and the Campbell County Bank (filed 5/25/2016) has second lien position. We have not conducted a lien search since 11/22/2017 and a newer lien search may show that Acushnet has terminated their lien; however, if they have not, then we are not the first lien position holder. Due to these facts we cannot guarantee a first lien position to PAULSEN.

Greg forwarded the email response to his attorney. He relied on counsel to resolve the issue and ultimately believed MG Honors could grant a first position lien. He did not inform the plaintiff about the email. Greg testified in his deposition he and Larry discussed the Acushnet lien and it was for Acushnet products only. (Doc. 50; 15-18-16:7; 17:9-18:11). The plaintiff testified that when the security agreement was signed, he was not aware of the lien or its priority position.

Campbell County Bank executed an assignment of security interest on January 30, 2019. (Doc. #39). Greg and Sara signed it only on behalf of MG Honors. The language assigning a "first position priority" was removed. Instead, the bank assigned to Paulsen "its security interest and lien position." MG Honors' representations regarding the priority were not removed. (Doc. #39).

In February 2019, MG Honors sold its Omaha location to Sweet Sport Golf, LLC, for $245,000. (Doc. #32).[1] MG Honors received $200,000 of the purchase price. An employee, Jason Gomez, received $45,000 on account of his "equity interest in Seller at the time of Closing." Gomez was also the member of Sweet Spot Golf, LLC. Gomez financed $45,000 of the price when MG Honors purchased the Omaha store.

Greg did not ask Paulsen to approve the Omaha sale and did not pay Paulsen the proceeds. The proceeds were deposited into the MG Honors account at Wells Fargo and were used to pay operating expenses. It is not clear when, but the Grand Island store closed next, leaving only the Kearney store. As locations closed, Greg moved inventory and equipment from one location to another. Through the closings, Paulsen was paid regular monthly payments of $10,000.

In June 2019, Paulsen demanded the note be paid in full by August 2019. No written demand was offered into evidence. No testimony was elicited regarding the period between June 2019 and November 2019. During that time, MG Honors had additional cash flow issues. The November 2019 payment was the last monthly payment Paulsen

---

[1] The asset purchase agreement in evidence was not signed. Greg believed the signed version was identical. The agreement is between MG Honors, LLC as "Seller", and Greg Davis as "Shareholder." Sara Davis is not a party to the agreement.

3

received. In late November 2019, the plaintiff and Greg met. The plaintiff testified Greg agreed to pay Paulsen the proceeds from the sale of the Omaha store "next week."

In December 2019, Paulsen demanded payment on the note. The plaintiff asked Greg to "jot down" the assets of the company because the Paulsen CFO wanted to review them and "just so we have a record." Greg created a list from memory and from company records. Greg provided the plaintiff an MG Honors asset list dated December 1, 2019. (Doc. #43). The assets in the summary totaled $1,194,503.[2]

Greg provided the plaintiff another document summarizing MG Honors' inventory, equipment, and cash by location. (Doc. #41). Greg did not recall when he created the summary or why or when he provided it to the plaintiff. The plaintiff asserts in his brief the summary is from December 11, 2019, but it is not dated. According to the summary, MG Honors had assets of $1,264,608.72 and liabilities of $1,704,577.67.[3]

The first week of January 2020 Greg decided to close the Kearney store and liquidate its assets, and to personally file bankruptcy. Online sales, manufacturer-direct-to-consumer sales, increasing lease payments, and lease payments on closed stores had taken their toll. Greg immediately scheduled a meeting with the plaintiff to tell him "face to face." Before the meeting, on January 9, 2020, the plaintiff learned about the Acushnet lien and its priority from his attorneys who conducted a UCC search.

On January 23, 2020, Greg went to the plaintiff's office to discuss the bankruptcy and liquidation. The plaintiff appears to have allowed the liquidation to take place. He did not testify as to any oversight to protect Paulsen's interests. MG Honors began liquidating the Kearney store the third week of January 2020. Greg gave 24 drinking cups to a dental office client at no charge. The cups were an overrun MG Honors had not paid for. They had the dental office name etched on them.

As the liquidation progressed, MG Honors deposited the proceeds into its operating account. It paid operational expenses to liquidate the business, including payroll, sales taxes, insurance, lease, and electricity.[4] The Nebraska Department of Revenue was paid $78,354.28 on account of fourteen months of delinquent sales taxes after an agent appeared at the store and threatened to shut it down and seize all the assets. Of the total, the department seized $30,000 directly from the company's bank account. Greg voluntarily paid other amounts.

Before and during the Kearney liquidation, MG Honors paid unsecured creditors. In November 2019, it paid $25,000 to American Express after a collection agency demanded

---

[2] The assets included Kearney inventory "at cost" of $557,000, "Corporate" inventory "at cost" of $224,000, and "4 Franchises" valued at $200,000 total.

[3] The assets included $50,000 of cash, $242,000 for "franchise values" for the five locations, $705,535.72 in total inventory, and $267,073 in total equipment. The totals include $141,572 for inventory and $37,673 in equipment for the Omaha location, although the Omaha transaction was an asset sale.

[4] MG Honors' bank statements from 2019 and 2020 and a checkbook history report from 2018 through 2020 are exhibits. (Doc. #46; Doc. #47). The court reviewed only the transactions discussed at trial or identified in the plaintiff's brief. (Doc. #60). The court deems the plaintiff to have waived any challenge not specifically raised or asserted at trial or in his brief.

4

payment. MG Honors used the card to purchase inventory. Greg also agreed to a payment plan of $3,000 per week. MG Honors paid $16,450 to American Express in 2020. On January 9, 2020, MG Honors paid Internet lender Kabbage $4,195.15. Kabbage debited the payment from the company bank account. Greg attempted to reverse and stop the debit. From February 2019 through November 2019 MG Honors paid $4,698.49 monthly to Greg's parents, who had taken out a loan for MG Honors. MG Honors paid Jeff Waggoner $7,000 on December 5, 2019, and $2,000 on January 5, 2020.

MG Honors sold inventory at a 10-80% discount. The liquidation lasted through the second week of March, when the store permanently closed. The COVID-19 pandemic accelerated the closing. The remaining assets were placed into trailers, a storage unit, and moved to Greg's father's house in Cozad.

On March 24, 2020, Paulsen assigned the note and security interest to the plaintiff. (Doc. #18). On April 20, 2020, the plaintiff filed a state court replevin and collection action. (Doc. #1; Part 4; #9). MG Honors turned over the assets. The plaintiff has not liquidated them. Greg and the plaintiff agreed the assets were worth $150,000 for the purpose of reducing the debt on the note. No testimony was offered as to how they arrived at this value, or whether it was cost or liquidation value. Detail regarding the inventory and its cost was stored on Golf USA corporate servers. Greg could still access the information. (Doc. #50; 5:10-6:7). Invoices and boxes of paperwork remain in the storage unit. (Doc 50; 27:25-28:22).

After the store closed, Acushnet threatened to foreclose its lien. The plaintiff prevented the sale by paying Acushnet approximately $59,000. He obtained an assignment of Acushnet's lien. After the bankruptcy was filed, MG Honors paid the plaintiff approximately $4,100 which was left in its bank account. The plaintiff was not aware of other MG inventory or equipment he had not already recovered.

While MG Honors operated, Greg met with the plaintiff and discussed the status of the stores. He kept the plaintiff informed about store closings and liquidations before they occurred. The plaintiff characterized discussions as "casual conversations." He testified he was not familiar with the problems the businesses were having. However, he stated Greg provided financial documentation, some of which was detailed. There was no evidence Greg refused to provide any information regarding the operations or collateral. When asked whether he thought Greg was dishonest, the plaintiff testified, "Yes – didn't follow through on promises."

The debtors filed their Chapter 7 petition on June 25, 2020. (Doc. #18). The debtors did not schedule a $63,000 debt to Jeff Waggoner. (BK 20-40868; Doc #1). Jeff told Greg he did not want to be listed. The debtors included him on their amended schedules. (Doc. BK20-40868; Doc. #48). Greg's parents also were not listed on the schedules. Greg was not obligated to pay them.[5] The debtors originally listed Acushnet as an unsecured

---

[5] It is not clear whether MG Honors or the debtors, or both, owed Mr. Waggoner or Greg's parents. MG Honors appears to owe the debt because it paid Mr. Waggoner and Greg's parents. No testimony was given regarding a personal loan or a personal guarantee. When discussing the debts, Greg used the phrases "I owed," or "I agreed" to pay. But he used the term "I" other times when he referred to MG Honors.

creditor. Greg scheduled it as unsecured because Acushnet had no security interest in their personal assets.

The debtors scheduled $0.00 in income for the years 2018 and 2019 on their statement of financial affairs, which was not accurate. The debtors were waiting for information from their CPA to accurately complete the SOFA. The debtors disclosed they had income during their 341 meeting and amended their schedules.

The debtors scheduled Greg Davis' one-third interest in Davis Grimm Capital LLC, valued at $7,307.00. (BK20-40868, Doc. #1). The interest is valued at $75,000 on the debtors' personal financial statement dated October 31, 2018. Greg explained the value of the entire company in 2018 was $75,000, not Greg's one-third interest. An undated balance sheet created by Greg's brother values each member's interest at $19,485.14.[6] (Doc. #24). Greg believes he accurately valued the interest in his schedules, applying discounts for the minority interest and marketability. Other than the undated balance sheet, the plaintiff did not offer evidence of the value of Davis Grimm Capital.

The debtors scheduled $7,000 in personal and household items. (BK20-40868, Doc. #1). They did not itemize their property. They amended their schedules to itemize the property, including $900 in collectible autographs and $1,405 in firearms. (BK20-40868, Doc. #53). The debtors' 2018 financial statement lists $25,000 of unspecified personal property, and "other assets" including $15,000 of collectible autographs and $12,500 of guns. (Doc. #40). The debtors believed they accurately scheduled their personal property. The debtors sold guns and other assets between 2018 and 2020. Most autographs and collectibles were turned over to the plaintiff with the equipment and inventory of MG Honors. Other than the almost two-year old balance sheet, the plaintiff did not offer any evidence the scheduled values were not accurate or that any assets were omitted.

A lifetime membership at Awari Dunes golf club is included in "other assets" on the debtors' 2018 financial statement, valued at $25,000. The membership is not scheduled. Greg did not schedule the membership because the golf club "revoked the transferability" of the membership and it had no value (Doc. 50; 53:2-14). Greg does not use the membership and he would assign it to the plaintiff if he could. The plaintiff did not offer any evidence of the current value of the membership.

The debtors scheduled their interest in MG Honors as worth $0.00. They did not schedule any of the company's individual assets. In addition to inventory, equipment, and franchise values, MG Honors' asset summary dated December 1, 2019, lists an etching machine valued at $45,000. The plaintiff asserts its value was $23,205 based on the financing agreement. (Doc. #42). The machine was acquired at a bulk discount and MG Honors paid a down payment. The machine had specialized enhancements. (Doc. 50; 30:9-24). Greg believed the $45,000 value was accurate.

Sara Davis worked for MG Honors until early 2018. The debtors used their personal savings to try to keep the business afloat, but she had little to no involvement with the business after she stopped working. She did not negotiate any loan agreements. She did not discuss the collateral with the plaintiff. She did not provide the personal or company financial statements or asset summaries. She did not know Greg provided the

---

[6] According to the exhibit, Davis Grimm owned assets worth $122,628.42 and owed $64,173 to creditors.

6

summaries to the plaintiff. She was not involved in the closing or sales of stores or liquidation of assets. She learned about a loan from Jeff Waggoner during the 341 meeting. She initially relied on Greg to complete the initial bankruptcy schedules, but thoroughly reviewed the amended schedules to make sure they were accurate.

The court finds the debtors to be credible witnesses. They answered questions completely and were not evasive. Their testimony was not impeached. They appeared remorseful for the business failure and inability to repay the plaintiff.

## Conclusions of Law

### *Discharge*

The Bankruptcy Code is designed to give honest but unfortunate debtors a fresh start. *See McDermott v. Petersen (In re Petersen)*, 564 B.R. 636, 644 (Bankr. D. Minn. 2017). The fresh start is accomplished through the bankruptcy discharge. But the debtors' conduct in their bankruptcy case may justify the court denying the discharge. *Id*. Denial of a discharge is a "harsh and drastic penalty." *Korte v. Internal Revenue Service (In re Korte)*, 262 B.R. 464, 471 (B.A.P. 8th Cir. 2001). The plaintiff asserts the debtors' discharge should be denied under 11 U.S.C. § § 727(a)(2), 727(a)(3), 727(a)(4)(A), and 727(a)(5). "The provisions of § 727 must be strictly construed in a debtor's favor." *McDermott v. Swanson (In re Swanson)*, 476 B.R. 236, 240 (B.A.P. 8th Cir. 2012). The plaintiff has the burden to prove each element of a claim under § 727 by a preponderance of the evidence. *See Floret LLC v. Sendecky (In re Sendecky)*, 283 B.R. 760, 763 (B.A.P. 8th Cir. 2002).

The plaintiff also asserts his claim is not dischargeable under 11 U.S.C. § § 523(a)(2)(A), 523(a)(2)(B), and 523(a)(6). Like grounds for denial of discharge, exceptions to discharge are "narrowly construed against the creditor and liberally against the debtor, thus effectuating the fresh start policy of the Code." *Willmar Elec. Servs. v. Dailey (In re Dailey)*, 592 B.R. 341, 349 (D. Neb. 2018). The plaintiff has the burden to prove each element of a claim under § 523 by a preponderance of the evidence. *Id.*

### *Transfer or Concealment of Assets Under § 727(a)(2)*

The plaintiff asserts the debtors destroyed or concealed property including collectibles, guns, and other personal assets, and the personal property of MG Honors. The debtors are not entitled to a discharge if they, within one year before filing their petition or after filing their petition, "transferred, removed, destroyed, mutilated, or concealed" property of the debtor or property of the estate with an "intent to hinder, delay, or defraud a creditor." *See* 11 U.S.C. § 727(a)(2).

The plaintiff has no claim under § 727(a)(2) regarding MG Honors' property. A limited liability company is a separate legal entity. *See* Neb. Rev. Stat. § 21-101 *et seq.*; *Thomas & Thomas Ct. Reps., L.L.C. v. Switzer*, 810 N.W.2d 677, 685 (Neb. 2012). The individual assets of MG Honors are not property of the debtor or property of the estate for the purposes of § 727(a)(2).

> [T]he debtor must have more than a mere *derivative interest* in the property in question because the term "property of the debtor," as expressed in 11 U.S.C.

7

> § 727(a)(2)(A), has reference to property in which the debtor has a *direct* proprietary interest.

*Northeast Nebr. Econ. Dev. Dist. v. Wagner (In re Wagner)*, 305 B.R. 472, 475 (B.A.P. 8th Cir. 2004) (rejecting a claim under § 727(a)(2) as a matter of law because the property transferred was property of the debtor's limited liability company). "Had Congress intended to include the transfer of property of another entity, it could have included that, but the language in subsection (2)(A) is sufficiently clear to eliminate such an interpretation." *Id.* at 476. In this case, only the debtors' membership interest in MG Honors is property of the estate, not its individual assets.

Even if assets of MG Honors properly were property of the debtors, the plaintiff did not establish his claim. Other than 24 engraved cups, he does not identify any particular property of MG Honors falling under § 727(a)(2). Instead, the claim is premised on the difference between $1,264,608.72 listed in MG Honors' asset summaries from December 2019 and the $150,000 in property recovered in April 2020. The plaintiff reasons $780,000 to $1,044,000 in assets "disappeared." This difference in value is overstated. The asset summary included $179,245 in assets sold with the Omaha store, $50,000 in cash, and $242,000 in franchise values. The inventory values are expressly listed at "cost," not liquidation value. The assets were liquidated at a 10-80% discount. The $150,000 remaining value was agreed to for the purpose of crediting the loan. The actual value is unknown. The plaintiff is not the first creditor secured primarily by inventory and equipment to find itself holding a significant deficiency claim on liquidation.[7]

The plaintiff established a gratuitous transfer of the 24 MG Honors engraved cups. They are not "valuable property." *See Armstrong v. Hemingford (Matter of Armstrong)*, 931 F.2d 1233, 1239 (8th Cir. 1991) ("Fraudulent intent is presumed in section 727(a)(2) cases in which the debtor has gratuitously conveyed *valuable* property.") (emphasis added). The cups cost nothing and could only be used by a single dental office. The plaintiff has no claim regarding the cups even if they were property of the debtors or property of the estate.

The plaintiff did not meet his burden of proof as to the collectibles and guns identified as "other assets." The plaintiff concludes that because the values listed on the debtors' 2018 financial statement differ from their bankruptcy schedules, he has a claim under § 727(a)(2). His conclusion is flawed. Almost two years passed between the financial statement and the bankruptcy. The debtors sold assets. The plaintiff recovered collectibles.

The plaintiff also did not establish the required intent to hinder, delay, or defraud. Given the difficultly proving actual intent with direct evidence, actual intent may be "inferred from the facts and circumstances of the debtor's conduct." *In re Korte*, 262 B.R. at 472–73. The plaintiff contends the debtors concealed property when they moved the MG Honors inventory from the Kearney store to trailers and storage units, and to Greg's parents' house. He asserts the intent is shown because the debtors "failed to disclose the location to the plaintiff" and "[t]he removal of the property from the business location of

---

[7] If the plaintiff reasonably believed the assets had more value or that he could recover a significant amount in a liquidation, it is not clear why he did not immediately recover the assets and sell them as Greg decided to close stores.

8

MG Honors resulted in [the plaintiff] having to use his rights as a judgment lien creditor to execute on and force the surrender of the property to him."

The plaintiff would turn every replevin action into a concealment of property. Concealment typically exists "where the interest of the debtor in property is not apparent but where actual or beneficial enjoyment of that property continued." *Korte* at 472. The debtors did not continue to use or enjoy the MG Honors assets. Although he demanded payment, the plaintiff did not request any assets be turned over. Rather, he allowed Greg to liquidate the Kearney store. It is not clear why, given his belief Greg was not following through on his promises. After the Kearney store closed, the inventory was moved to facilities owned by the plaintiff's very close, long-term, friends. The plaintiff waited until April 2020 to file his replevin action and the debtors did not obstruct the action. Resort to legal action was the plaintiff's choice.

*Failure to Preserve Records Under § 727(a)(3)*

The plaintiff asserts the debtors destroyed or failed to preserve information from which the business transactions involving the disposition of the MG Honors assets might be ascertained. The debtors are not entitled to a discharge if they:

> concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case.

11 U.S.C. § 727(a)(3). The plaintiff asserts the debtors had to establish "the assets sold, the money received" and the location of the missing dollar value of personal property of MG Honors. To the extent the claim is based on the dollar value of missing personal property, it fails for the reasons stated above.

The plaintiff did not establish that he requested any records, any records were destroyed, or existing records were inadequate. The plaintiff has the burden of proof, not the debtors.

> Under § 727(a)(3), a debtor's burden to show that his record keeping was reasonable under the circumstances is triggered only after the party seeking to deny his discharge establishes that inadequate records exist. That burden was never triggered here.

*In re Swanson*, 476 B.R. at 240. The plaintiff did not trigger the debtors' burden and the evidence establishes the opposite conclusion. MG Honors' bank records from February 1, 2019, through June 30, 2020, and a checkbook history report are exhibits. Records were stored on Golf USA corporate servers. Greg could still access them. A company computer and boxes of records were in storage.

*False Oath Under § 727(a)(4)(A)*

The plaintiff asserts the debtors should be denied a discharge because they "made false oaths of material facts in connection with the bankruptcy case." The debtors are not entitled to a discharge if they "knowingly and fraudulently, in or in connection with the

9

case … made a false oath or account." 11 U.S.C. § 727(a)(4)(A). The Bankruptcy Code "requires nothing less than a full and complete disclosure of any and all apparent interests of any kind." *In re Korte*, 262 B.R. at 474. The bankruptcy system "depends upon the debtor providing complete, accurate and reliable information in the petition and other documents submitted with the petition so that parties in interest may evaluate a debtor's assets and liabilities and appropriately administer the case." *Horizon Fin. Bank v. Borstad (In re Borstad)*, 550 B.R. 803, 833 (Bankr. D.N.D. 2016).

> Section 727(a)(4)(A) "provides a harsh penalty for the debtor who deliberately secretes information from the court, the trustee, and other parties in interest in his case.". . . For such a false oath or account to bar a discharge, the false statement must be both material and made with intent.

*In re Korte*, 262 B.R. at 474. Knowledge and intent are separate requirements.

The plaintiff asserts the debtors made multiple false statements regarding the assets of MG Honors, their personal assets, and their creditors. "As with § 727(a)(2), fraudulent intent under (a)(4) may also be 'inferred from the facts and circumstances of the debtor's conduct.'" *U.S. Trustee v. Beard (In re Beard)*, 595 B.R. 274, 295 (Bankr. E.D. Ark. 2018). The cumulative effect of falsehoods evidencing a "pattern of reckless and cavalier disregard for the truth" may support a finding of fraudulent intent. *Id*.

The plaintiff did not establish a pattern of false statements. The debtors are not required to schedule individual MG Honors assets. The plaintiff's claim that the debtors' personal property and interest in Davis Grimm are undervalued is based on an old financial statement. The premise does not hold up given the passage of time. The plaintiff did not establish the asset values were false at the time the petition was filed. As to their income, the debtors omitted their income but informed the trustee of the omission during the 341 meeting. They corrected it. The missing creditors appear to be creditors of MG Honors. Even if personal, the debtors satisfactorily explained their omission.[8] The plaintiff did not establish "cumulative" errors or omissions.

Regarding the Awari Dunes golf membership, the plaintiff did not establish the omission was knowingly and fraudulently made. The debtors' testimony also negated any bad intent. There was no evidence Sara knew about the membership or its value. While the interest should have been scheduled, Greg retained and relied upon counsel to schedule their assets. *See In re Sendecky*, 283 B.R. 760, 765 (holding reliance on counsel can excuse fraudulent intent). The debtors did not conceal or use the membership. *See In re Korte*, 262 B.R. at 474 (denying discharge where the debtor continued to use property personally and for business). Greg did not schedule the interest because he believed it had no value after he received a notice from the club stating the membership could not be transferred. Greg was willing to turn it over to the plaintiff. *See First Neb. Bank v. Balfour (In re Balfour)*, No. AP 18-8337-SKH, 2020 WL 412184, at *14 (Bankr. D. Neb. Jan. 24, 2020) (holding bank failed to establish intent and the willingness of the debtors

---

[8] While debtors should schedule all their creditors, assuming they were creditors of a debtor, the omission in this case did not impact the value of the estate. Also, the failure to schedule a creditor has its own consequence. The debtors are not discharged from unscheduled debts. *See* 11 U.S.C. § 523(a)(3).

to turn over property they owned negated fraudulent intent). The debtors' testimony is credible.

Though not required, the plaintiff also did not offer any other circumstantial evidence of fraud including "badges of fraud." *In re Beard*, 595 B.R. at 291 ("Courts generally look to certain factors referenced as 'badges of fraud' to determine whether fraudulent intent exists."). Also, the plaintiff did not brief the "knowingly" and "fraudulently" elements of § 727(a)(4)(A). Under all the circumstances, his claim must be denied.

*Deficiency of Assets Under § 727(a)(5)*

The plaintiff asserts the debtors should be denied a discharge because they did not explain the deficiency in the "inventory, equipment, signage, and fixtures of MG Honors." The debtors are not entitled to a discharge if they "failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities." 11 U.S.C. § 727(a)(5).

The MG Honors assets are not the debtors' assets. As with claims under § 727(a)(2), the debtors did not have to explain any claimed loss or deficiency. *See Fiandola v. Moore (In re Moore)*, 619 F. App'x 951, 954 (11th Cir. 2015) (holding the debtors "should not be denied a discharge of debts under 11 U.S.C. § 727(a)(5) because they were under no obligation to explain the loss of corporate owned assets in a single-member limited liability corporation."); *Rosenberg Ventures, Inc. v. Velasco (In re Velasco)*, 617 B.R. 718, 731 (Bankr. M.D. Fla. 2020) (holding § 727(a)(5) "speaks to the Debtor's failure to explain the loss of his own—not someone else's—assets").

Even if the assets were the debtors' assets, the plaintiff did not establish a loss or deficiency. "Similar in operation to § 727(a)(3), a debtor's burden (of production) to explain the loss of assets is not triggered until the plaintiff establishes that an actual loss of assets has occurred." *In re Swanson*, 476 B.R. at 241. As to MG Honors' personal property, inventory from closed stores was sold or moved to other stores. Inventory was sold during the final liquidation. The debtors cooperated in turning over these assets. Equipment was recovered by third parties or held by the landlords. The plaintiff seized the remaining assets.

The plaintiff did not brief the issue. To the extent his claim under § 727(a)(5) includes property of the debtors or of the estate, including without limitation the "other assets," for the reasons stated above, the plaintiff did not establish a deficiency. Also, the debtors satisfactorily explained the difference in the values of their scheduled assets compared to the values in their personal financial statement.

*523(a)(2)(A) – Receipt of money by fraud*

The plaintiff asserts the debt he is owed is excepted from discharge because the debtors falsely represented Paulsen would have a first position lien against MG Honors' assets. A debtor is not discharged from a debt "to the extent obtained by false pretenses, a false representation, or actual fraud." 11 U.S.C. § 523(a)(2)(A). To prevail on his claim, the plaintiff must establish:

> (1) the debtor made a representation; (2) the debtor knew the representation was false at the time it was made; (3) the representation was deliberately made for

11

the purpose of deceiving the creditor; (4) the creditor justifiably relied on the representation; and (5) the creditor sustained the alleged loss as the proximate result of the representation having been made.

*In re Dailey*, 592 B.R. at 349. This claim applies only to the $1.7 million loan, which Paulsen made on December 21, 2018. The only written representation is in the assignment of Campbell County Bank's security interest. The note, which was signed more than one month before the security agreement, does not identify collateral, or reference a first position lien.

Before the note was signed, the plaintiff informed Greg that Paulsen wanted a first position lien. It is not clear Greg represented he could grant it. If Greg did, it could amount to a representation. "[A] debtor's promise related to a future act can constitute a false representation where the debtor possesses no intent to perform the act at the time the debtor's promise is made." *Id.* at 350. But a "promise to pay a debt in the future is not a misrepresentation merely because the debtor fails to do so." *Id.* Likewise, even if Greg promised a first position lien before the loan was made, the promise alone is not a misrepresentation merely because it did not happen. The court is satisfied at the time he signed the security agreement, Greg believed MG Honors could grant Paulsen a first position lien.

The plaintiff did not establish reliance on any representation regarding a first lien position. The plaintiff decided to make the first loan personally and the second loan on behalf of Paulsen. He personally loaned $1 million on a wholly unsecured basis. Paulsen made its loan at least 40 days before any security interest was granted and before Campbell County Bank's collateral position was assigned.[9] Paulsen was not concerned about the value of or extent of the collateral when it made the loan. The plaintiff did not request an asset list from MG Honors until November 2019, almost a year later. He requested it so Paulsen "had a record," not for any underwriting purpose. The plaintiff's motivation, both personally and as the president of Paulsen, was to help Greg, the son of a very good family friend, and to shift the debt from himself to Paulsen because he did not want to be a bank.

As with the other claims, the plaintiff did not establish an intent to deceive. "Because direct proof of intent (*i.e.*, the debtor's state of mind) is nearly impossible to obtain, the creditor may present evidence of the surrounding circumstances from which intent may be inferred." *Northland Nat'l Bank v. Lindsey (In re Lindsey)*, 443 B.R. 808, 815–16 (B.A.P. 8th Cir. 2011) (citations omitted). Such circumstances do not exist. The debtors are credible and testified truthfully. They cooperated with the plaintiff and Paulsen. Greg kept both informed of the circumstances of the business.

---

[9] Unlike other sections, § 523(a)(2)(A) is limited. It excepts a debt from discharge only "to the extent obtained by" a false representation. Paulsen's $1.7 Million debt was secured by a lien on all MG Honors assets. The lien had priority over all other liens except Acushnet. The plaintiff paid the Acushnet lien and obtained its first position. Even if the plaintiff had proved his claim under § 523(a)(2)(A), his claim is limited to the $59,000 he paid Acushnet.

12

*523(a)(2)(B) – Receipt of money with false financial statement*

The plaintiff asserts the debt is excepted from discharge because the debtors provided a false financial statement. A debtor is not discharged from a debt:

> to the extent obtained by –
> . . .
> (B) use of a statement in writing –
>     (i) that is materially false;
>     (ii) respecting the debtor's or an insider's financial condition;
>     (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
>     (iv) that the debtor caused to be made or published with intent to deceive[.]

11 U.S.C. § 523(a)(2)(B). The plaintiff did not establish, or even brief, that the debtors intended to deceive.

The plaintiff asserts the debtors overstated the values of MG Honors' assets, including a laser etching machine, inventory, signage, and franchise values in the December 1, 2019, asset listing. MG Honors is an insider of the debtors under 11 U.S.C. § 101(31). But for the reasons stated above, the plaintiff did not establish the MG Honors' asset summaries contained materially false information. Also, no debts were obtained by a false financial statement of MG Honors. Greg provided financial information regarding MG Honors in December 2019, almost a year after Paulsen made the $1.7 million loan.

The plaintiff asserts the personal financial statement dated October 31, 2018, contained false information. The 2016 loan was not obtained by the debtors' 2018 personal financial statement because Greg provided the statement in 2018. The 2018 loan was not obtained by the 2018 personal financial statement and the plaintiff did not establish Paulsen relied on it. *See In re Lindsey*, 443 B.R. at 814–15 (finding the creditor did not rely upon a financial statement but agreed to loan money for other reasons). The plaintiff personally loaned MG Honors $1 million without a financial statement. He decided to make the Paulsen loan based upon his desire to help a friend, and because he did not want to be a bank. His decisions were not based upon the financial condition of the debtors. He provided no evidence he or Paulsen used the personal financial statement or how the statement was used to make the decision to loan money.

The plaintiff did not establish a financial statement was materially false. "A written statement is materially false if it paints a substantially untruthful picture of the debtor's financial condition by misrepresenting information that would normally affect the lender's decision to extend credit." *Id.* at 813. The contention that MG Honors' financial statements were materially false is based upon the flawed comparison of values. While the value of Davis Grimm Capital was overstated by approximately $55,000, the overstatement was 3.24% of the total debt. The court is convinced Paulsen would have made a $1.7 million loan to MG Honors even if the values were accurate.

*523(a)(6) Willful and malicious injury*

The plaintiff asserts the debt is excepted from discharge as a willful and malicious injury. A debtor is not discharged from a debt "for willful and malicious injury by the

13

debtor to another entity or to the property of another entity." 11 U.S.C. 523(a)(6). He claims the debtors willfully and maliciously paid unsecured creditors instead of paying secured creditor Paulsen.[10]

The plaintiff's claim against Sara fails because to be excepted from discharge, the willful and malicious injury must have been committed "by the debtor." 11 U.S.C. § 523(a)(6). "[T]he willful and malicious conduct of others, even if the debtor may be legally responsible for that conduct under state law, cannot be imputed to the debtor for purposes of Section 523(a)(6)." *Greer v. Bruce (In re Bruce)*, 593 B.R. 765, 777 (Bankr. S.D. Ohio 2018); *see also Davis v. Melcher (In re Melcher)*, 319 B.R. 761, 777 (Bankr. D.D.C. 2004) ("In contrast to § 523(a)(2)(A), an injury done by a debtor's agent, and not by the debtor, but imputed to a debtor under nonbankruptcy law, fails to satisfy § 523(a)(6) because the injury must be 'by the debtor'."). Greg made all business decisions for MG Honors. Sara did not violate the security agreement and did not know who MG Honors paid. She cannot be liable under § 523(a)(6).[11]

Willfulness and maliciousness are separate requirements under § 523(a)(6). The word "willful" modifies the "injury" and requires a deliberate or intentional injury. A deliberate or intentional act that leads to injury is not sufficient. *See Kawaauhau v. Geiger*, 523 U.S. 57, 57–58, 118 S. Ct. 974, 975, 140 L. Ed. 2d 90 (1998); *see also James v. West (In re West)*, No. 16-40358-CAN7, Adv. No. 16-4083-CAN, 2017 WL 746250, at *34 (Bankr. W.D. Mo. Feb. 24, 2017) ("Thus, as a general rule, debts resulting from breach of contract, even debts resulting from intentional breach of contract, are not excepted from discharge under § 523(a)(6).").

"When transfers in breach of security agreements are in issue, we believe nondischargeability turns on whether the conduct is (1) headstrong and knowing ("willful") and, (2) targeted at the creditor ("malicious"), at least in the sense that the conduct is certain or almost certain to cause financial harm." *Barclays Am./Bus. Credit, Inc. v. Long (In re Long)*, 774 F.2d 875, 881 (8th Cir. 1985). "Debtors who willfully break security agreements are testing the outer bounds of their right to a fresh start, but unless they act with malice by intending or fully expecting to harm the economic interests of the creditor, such a breach of contract does not, in and of itself, preclude a discharge." *Id*. at 882.

The plaintiff did not prove the debtors acted maliciously. A conversion of collateral may be malicious, for example, if the debtor "conceal[ed] the disposition of the collateral from the creditor, placed proceeds in a separate account, or covered up a scheme." *Van Daele Bros, Inc. v. Thoms (In re Thoms)*, 461 B.R. 50, 55 (Bankr. N.D. Iowa 2011).

---

[10] MG Honors paid $4,698 each month from February 2019 through November 2019 to Greg's parents; paid Jeff Waggoner $7,000 on December 5, 2019, and $2,000 on January 5, 2020; paid Thomas Tvrdik of $1,000 per month through December 31, 2019; paid American Express $28,000 in November 2019, and approximately $20,000 in 2020; paid internet lender Kabbage $5,242.32 in January 2020; and paid the Nebraska Department of Revenue $78,354.28 in February and March 2020 for delinquent sales taxes after the Department threatened to shut down the store.

[11] The court need not reach the issue, but Greg may also be protected by this line of cases. The acts that led to the alleged injury were committed by MG Honors. Greg made the business decisions for MG Honors, but the plaintiff did not seek to pierce the entity veil of the company or to hold Greg personally liable as its alter ego.

"[W]ithholding payment is not malicious if it is done to allow the debtor to remain in business or to protect his financial interests." *Brown v. Heister (In re Heister)*, 290 B.R. 665, 675 (Bankr. N.D. Iowa 2003) (denying claim where the parties had a pre-existing relationship which was affected by the debtor's financial difficulties and there was "no indication that Debtor maliciously used the proceeds"). Likewise,

> A debtor's retention of the proceeds of sales of collateral, while clearly a breach of a security agreement, is not enough to establish malice. When a debtor has used the proceeds in an attempt, albeit unsuccessful, to keep a business afloat, malice may not necessarily be inferred from the debtor's conduct.

*Legendary Loan Link, LLP v. Glatt (In re Glatt)*, 315 B.R. 511, 521–22 (Bankr. D.N.D. 2004) (citations omitted); *see also Community Nat'l Bank v. Slominski (In re Slominski)*, 229 B.R. 432, 438 (Bankr. D.N.D. 1998) (holding the creditor "utterly failed" to establish willfulness or maliciousness because it "failed to demonstrate in any way that [the debtor] intended not only the act of conversion of the bank's collateral, *but also the attendant harm which the bank thereby suffered*."); *First Fed. Bank v. Mulder (In re Mulder)*, 306 B.R. 265, 270 (Bankr. N.D. Iowa 2004) (denying dischargeability claim under § 523(a)(6) where the proceeds of collateral were garnished).

Greg's efforts were designed to keep the Kearney store open to maximize the recovery for MG Honors and Paulsen, not to cause harm. Several payments were auto debits, which Greg attempted to stop. Greg kept the plaintiff informed of MG Honors' financial difficulties. The plaintiff knew MG Honors was closing stores while Paulsen was only paid a regular monthly payment. In January 2020, Greg personally informed the plaintiff that the Kearney store would be closed, and its inventory liquidated. Paulsen either agreed to allow Greg to liquidate or acquiesced in the liquidation. The liquidation lasted several months. The plaintiff and Paulsen had to expect MG Honors would pay expenses to facilitate the liquidation. The plaintiff did not demand any collateral be turned over until he filed a replevin action on April 20, 2020, over one month after Paulsen assigned the debt to the plaintiff.

## Conclusion

For the above reasons, judgment will be entered in favor of the debtors/defendants and against the plaintiff.

Dated: August 13, 2021.

BY THE COURT

/s/ Brian S. Kruse
Brian S. Kruse
Bankruptcy Judge

Copies provided by the court to:
Carly Bahramzad
Eric D. Miller
Trev Peterson
Michael D. Carper
United States Trustee